25-35 (L)
SEC v. Rogas

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2025

(Argued: November 19, 2025          Decided: August 6, 2026)

Docket Nos. 25-35 (Lead), 25-36 (Con)

_____

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

UNITED STATES OF AMERICA,

*Intervenor,*

- v. -

ADAM P. ROGAS,

*Defendant-Appellant,*

PILLSBURY WINTHROP SHAW PITTMAN LLP,

*Appellant,*

PAUL G. KOROL,

*Defendant*,

NS8 FP, LLC, MVP 2020, LLC, ROGASSI ENTERPRISES, LLC,

*Relief-Defendants*.

_____

Before:  KEARSE, RAGGI, and LIVINGSTON, *Circuit Judges*.

In these consolidated appeals, defendant Rogas in No. 25-36 appeals from a December 12, 2024 order of the United States District Court for the Southern District of New York, Richard M. Berman, *Judge*, granting the motion of plaintiff United States Securities and Exchange Commission in this civil action to bar Rogas, for life, from serving as an officer or director of any public company, following (a) the September 18, 2024 entry of an interim consent judgment that, *inter alia*, held him liable for more than $17,500,000 in net profits he gained through his violations of § 17(a) of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder, and permanently enjoins him from directly or indirectly violating those provisions, and (b) his November 3, 2022 conviction of securities fraud in violation of the Exchange Act, Rule 10b-5, and 18 U.S.C. § 2, *see United States v. Rogas*, 20-CR-539 (S.D.N.Y. Nov. 3, 2022).  In No. 25-35, Rogas and his attorneys Pillsbury *et al*. appeal from the court's December 2, 2024 order requiring Pillsbury to turn over $3,612,601.76,

the remainder of a $4 million retainer from Rogas that was held by Pillsbury on September 18, 2020--the date it was notified of a temporary restraining order freezing Rogas's assets and funds held for his benefit, which became a September 24, 2020 freeze order--along with any gains Pillsbury obtained from holding the frozen funds after the imposition of that freeze.

On appeal in No. 25-36, Rogas contends that the district court abused its discretion in barring him for life, rather than for a shorter period, from serving as an officer or director of any publicly traded company. In No. 25-35, Rogas and Pillsbury contend that the district court erred in ruling that the $3,612,601.76 were covered by the freeze order, arguing principally that the $4 million sent by Rogas as an advance payment for legal services had become the property of Pillsbury, not Rogas, before the temporary restraining order was entered. Finding no error or abuse of discretion in either decision, we affirm in No. 25-36 the district court's order permanently barring Rogas from serving as an officer or director of a publicly traded company; we affirm in No. 25-35 the district court's order directing Pillsbury to deposit with the registry of the court $3,612,601.76, together with any gains Pillsbury obtained from holding those frozen funds after being notified of the freeze.

No. 25-36, affirmed. No. 25-35, affirmed.

PAUL G. ALVAREZ, Senior Appellate Counsel, Washington, D.C. (Jeffrey B. Finnell, Acting General Counsel, Jeffrey A. Berger, Assistant General Counsel, Securities and Exchange Commission, Washington, D.C., on the brief), *for Plaintiff-Appellee*.

ANNE M. VOIGTS, Pillsbury Winthrop Shaw Pittman, Palo Alto, California (David Oliwenstein, Pillsbury Winthrop Shaw Pittman, New York, New York, on the brief), *for Defendant-Appellant and Appellant*.

KEARSE, *Circuit Judge*:

In these consolidated appeals, defendant Adam P. Rogas in No. 25-36 appeals from the December 12, 2024 order of the United States District Court for the Southern District of New York, Richard M. Berman, *Judge*, granting the motion, in this civil action, by plaintiff United States Securities and Exchange Commission ("SEC" or "Commission") to bar Rogas, for life, from serving as an officer or director of an issuer that has a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq.*, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, *see United States Securities and Exchange Commission v. Rogas*, 20-CV-7628, 2024 WL 5088097, at *9 (S.D.N.Y. Dec. 12, 2024) ("*SEC v. Rogas II*"), following (a) the September 18, 2024 entry of an interim

consent judgment that, *inter alia*, held Rogas liable for more than $17,500,000 in net profits he gained through his violations of § 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77a *et seq.*, § 10(b) of the Exchange Act, 15 U.S.C. § 78b, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and permanently enjoins him from directly or indirectly violating those provisions, and (b) his November 3, 2022 conviction of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2, *see United States v. Rogas*, 20-CR-539 (S.D.N.Y. Nov. 3, 2022) ("*U.S. v. Rogas*"). In No. 25-35, Rogas and his attorneys Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury" or "PWSP") appeal from the court's December 2, 2024 order requiring Pillsbury principally to turn over $3,612,601.76, the remainder of a $4 million retainer from Rogas that was held by Pillsbury on September 18, 2020--the date it was notified of a temporary restraining order freezing Rogas's assets and funds held for his benefit, which was succeeded by an Asset Freeze and Order Granting Other Emergency Relief, dated September 24, 2020 ("Freeze Order"), continuing the freeze for the duration of this action. *See United States Securities and Exchange Commission v. Rogas*, 20-CV-7628, 2024 WL 4930362, at *8 (S.D.N.Y. Dec. 2, 2024) ("*SEC v. Rogas I*").

On appeal in No. 25-36, Rogas contends that the district court abused its discretion in barring him for life, rather than for a shorter period, from serving as an

officer or director of any publicly traded company (the "Officer and Director Bar").  In No. 25-35, Rogas and Pillsbury contend that the district court erred in ruling that the $3,612,601.76 were covered by the Freeze Order, arguing principally that the $4 million sent by Rogas as an advance payment for legal services had become the property of Pillsbury, not Rogas, before the temporary restraining order was entered.

For the reasons that follow, we find no error or abuse of discretion in either decision.  We affirm in No. 25-36 the district court's order permanently barring Rogas from serving as an officer or director of a publicly traded company.  In No. 25-35, we affirm the district court's order directing Pillsbury to deposit with the registry of the court $3,612,601.76, representing what remained of the $4 million from Rogas when Pillsbury was informed of the freeze on Rogas's assets and on funds to be used for his benefit, together with any gains Pillsbury obtained from holding the frozen funds after the imposition of the freeze.

# I.  BACKGROUND

This civil action has its origin in misdeeds by Rogas from January 2018 through June 2020 in connection with three offerings of securities in NS8, Inc. ("NS8"

or the "Company"), a technology company co-founded by Rogas in 2016, which offered e-commerce merchants software to detect and prevent fraud. As summarized below, the SEC's Amended Complaint (*see* A.91-125)--the allegations of which are no longer disputed by Rogas in connection with the Officer and Director Bar--shows that every month for 2½ years, Rogas caused NS8's business and revenue to be grossly overstated, misrepresentations that were relayed by NS8 to current and potential investors. During that period, NS8 raised approximately $149 million through offerings of NS8 securities. From the $149 million thus raised, NS8 repurchased shares of its stock from, *inter alia*, Rogas, who thereby personally, and through an entity he owned, received a net profit of more than $17.5 million.

A. *Rogas's Misrepresentations as to NS8's Revenue Bank Account*

During the relevant period, Rogas served as NS8's President and Chief Executive Officer. (*See* Amended Complaint ¶ 12; Declaration of Adam P. Rogas dated Sept. 5, 2023 ("Rogas Decl."), ¶ 3.) Although NS8 had a finance department, only Rogas had access to the bank account in which NS8 collected revenue from its customers (the "Revenue Account"). (*See* Amended Complaint ¶¶ 27, 29.) Beginning no later than January 2018, and continuing through at least June 2020, Rogas falsified the bank

-7-

statements for NS8's Revenue Account by downloading electronic copies and altering their text (a) to change payers' names, which exaggerated the number of customers NS8 had, and/or (b) to change the amounts received and inflate the amount of revenue NS8 was receiving from its actual customers. (*See id*. ¶¶ 28, 31.)

In each of the 30 months in that period, Rogas inflated the balances that had appeared in the genuine bank statements for NS8's Revenue Account. (*See id*. ¶ 31.) In all but one of those months, the falsely inflated amount was higher than the falsely inflated amount for the prior month; and the falsifications became massive. (*See id*.) For example, in November 2018, Rogas doctored NS8's Revenue Account statement to show a balance of more than $5.1 million, when in fact its balance was less than $2,000. (*See id*.) Indeed, in none of those 30 months was NS8's actual balance in the Revenue Account ever as high as even $4.1 million, but Rogas's fraudulently inflated amounts rose steeply. (*See id*.) In September 2019, Rogas doctored NS8's Revenue Account statement to show a balance of more than $23.7 million, when in reality its balance was less than $6,000. (*See id*.) In June 2020, Rogas doctored NS8's Revenue Account statement to show a balance of $62,088,506.43. (*See id*.) That exceeded its actual balance--$28,051.47--by more than $62 million. (*See id*.)

NS8's financial statements were prepared by the Company's finance

department personnel, who did not have access to its actual Revenue Account statements. (*See id*. ¶¶ 27, 29.) Rogas sent the doctored, revenue-inflated Revenue Account statements to the finance team, which incorporated them in financial representations made to current and prospective NS8 investors. (*See id*. ¶¶ 29, 30.) Rogas's misrepresentations were also used by the finance department in preparing the Company's financial statements, which were also provided to current and prospective investors. (*See id*.)

As NS8's CEO, Rogas personally reviewed and distributed these misleading financial statements with knowledge that they were based on bank statements that he had falsified. (*See id*. ¶ 30.) Rogas also used falsified statements to deceive prospective investors while they were conducting "due diligence." (*Id*. ¶ 34.) For example, during NS8's Spring 2020 offering, Rogas provided investors and their agents with falsified Revenue Account statements that artificially inflated NS8's revenue by tens of millions of dollars, and in one instance, the due-diligence "consultant" for a group of investors "discovered that the line items in the August 2019 Revenue Account statement did not add up to the total balance reflected on that statement." (*Id*. ¶¶ 34-38.) When Rogas was asked about the discrepancy, he "re-doctored the August 2019 Revenue Account bank statement to include an

additional false deposit of $1 million, causing the line items to add up to the false total balance." (*Id*. ¶ 39.) Investors in NS8 relied on Rogas's falsified documents to their detriment. (*See id*. ¶¶ 36, 42, 46.)

Rogas's misrepresentations were highly profitable for him personally. With the money NS8 received from investors in its offerings, it conducted a tender offer to preexisting shareholders. Rogas tendered shares he owned, and he received more than $17.5 million directly and through an entity he wholly controlled. (*See* Rogas brief on appeal at 7; Amended Complaint ¶¶ 14, 112, 124.) Rogas later transferred approximately $10 million of these funds to an account associated with PhutureCorp Inc. ("PhutureCorp"), another entity he controlled.

Despite Rogas's exclusive access to the real Revenue Account statements, his fraud had not gone unnoticed by some NS8 employees. In 2018 and early 2019, an NS8 employee ("Employee") raised concerns internally that NS8's "customer data (including purported customer numbers and monthly revenue) used to formulate external communications--including to potential and existing investors--was false." (Amended Complaint ¶ 57.) In July 2019, "through [whistleblower] counsel, the Employee submitted an anonymous tip to the SEC explaining that NS8 and Rogas may have overstated its number of customers and its revenue, and that the incorrect

numbers may have been used in a securities offering."  (*Id*. ¶ 58.)

On August 9, 2019, after the Employee "reiterated"--to his supervisor and to NS8's Chief of Staff ("COS")--"his concerns that NS8 may have falsely inflated customer counts" (*id*. ¶¶ 59-60), Rogas was alerted by the COS and promptly took steps to remove the whistleblower's access to NS8's internal systems and to determine how much the Employee knew.  (*See id*. ¶¶ 61-64.)  That evening, the Employee's access to NS8's building was revoked.  (*See id*. ¶ 65.)  The next day, the COS gave Rogas the Employee's NS8-issued laptop and password, and Rogas searched the computer. (*See id*. ¶¶ 66-67.)  He gained access to the Employee's saved personal passwords, and thereby to his Hotmail account, which contained his "correspondence with his whistleblower counsel who assisted his reporting to the SEC," and to his Dropbox account, which contained "the exhibits that the Employee's counsel submitted to the SEC." (*Id*. ¶ 67.)  At the direction of Rogas, the Employee was fired on or about August 15, 2019.  (*See id*. ¶ 70.)

The SEC, based on the tip it had received, began investigating NS8.  In November 2019, it issued subpoenas to Rogas and NS8 "in connection with an investigation into potential fraudulent conduct in a prior NS8 securities offering"; it issued additional subpoenas to Rogas and NS8 in March 2020.  (*Id*. ¶¶ 8, 72.)  Rogas

continued through June 2020 to falsify NS8's Revenue Account statements and to distribute misleading financial statements in securities offerings, despite receiving these subpoenas. (*See id*. ¶¶ 8, 31, 73.)

In late August 2020, another "employee[] in NS8's finance department discovered the true balance of funds in the Revenue Account and the falsified transactions were uncovered." (*Id*. ¶ 74.) Also in late August, Rogas contacted Pillsbury seeking personal representation in connection with any issues concerning his role as President and CEO of NS8. (*See*, *e.g.*, Part III below.) Rogas resigned from NS8 in a September 1, 2020 email. (*See id*. ¶ 75; Rogas Decl. ¶ 5.)

B. *The Fallout*

1. *Commencement of the Present Case and the Asset Freeze*

On September 17, 2020, the SEC commenced the present civil action against Rogas, alleging that he had intentionally provided prospective investors with falsified information as to NS8's customer base and Revenue Account balances (1) in the offer or sale of NS8 securities, in violation of § 17(a) of the Securities Act, and (2) in connection with the purchase or sale of NS8 securities, in violation of § 10(b) of the Exchange Act and Rule 10b-5 thereunder. As relief, the original complaint--like the

Amended Complaint, which in November 2022 superseded it--requested principally that Rogas be permanently enjoined from engaging in similar conduct in violation of those provisions, and that he be required "to disgorge ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains." (A.51 (original complaint); A.124 (Amended Complaint).)

Prior to filing the original complaint, the SEC had filed an *ex parte* emergency motion for a temporary restraining order ("TRO") to "'freez[e] assets'" of Rogas and the relief defendants "'in order to prevent further misappropriation of investor funds and provide a corpus for returning investor funds to investors.'" *SEC v. Rogas I*, 2024 WL 4930362, at *4 (quoting SEC Emergency Motion for TRO dated September 14, 2020, at 1). Judge Paul A. Crotty, to whom the case then was assigned, granted the TRO and scheduled a hearing as to why such a freeze should not extend until the resolution of the action. (*See* A.53, 61-62.) As discussed in Part III below, Pillsbury was given notice of the TRO on the morning of September 18, 2020. The Freeze Order was entered on September 24, ordering that Rogas's assets and property (and property of the relief defendants) "wherever located or by whomever held, and whether acquired before or after institution of this action, are frozen" "pending resolution of the merits of this matter through trial or otherwise." (A.66.)

-13-

On September 17, 2020, Rogas was arrested and charged by the United States Department of Justice ("DOJ"), on a sealed criminal complaint that was unsealed by the court on that date, in the United States District Court for the Southern District of New York. *See U.S. v. Rogas*, 20-CR-539. In February 2021, the DOJ was allowed to intervene in the SEC's present action, and the DOJ's motion to stay the present action (except for the SEC's issuing subpoenas to financial institutions) pending conclusion of the criminal case was granted on consent of the parties.

In or about April 2021, Rogas violated the Freeze Order by transferring, without court permission, more than $1.6 million held on deposit for one of his companies covered by the freeze, to a newly opened account at another bank. Rogas used some $500,000 of these funds to purchase luxury goods, including a swimming pool, hockey tickets, and a garden fountain; and he converted more than $1.1 million into cryptocurrency. When this was discovered, Rogas conceded that the "funds spent or transferred . . . were clearly within the Court's asset freeze order," and he assured that "he w[ould] commit no further violations." (A.81.) He "agreed," with the permission of the court, "to transfer whatever remain[ed] of the more than" $1.6 million he had spent or transferred "into the registry of the Court." (*Id.*)

-14-

### 2. *Rogas's Criminal Case*

In the meantime, in *U.S. v. Rogas*, Rogas had been indicted on October 13, 2020, charged with two counts of securities fraud and one count of wire fraud for his fabrication and transmission of NS8's bank and financial statements in connection with NS8's 2019 and 2020 securities offerings. In March 2022, pursuant to a plea agreement, Rogas pleaded guilty to one count of securities fraud. He was ultimately sentenced principally to 60 months' imprisonment, to be followed by 3 years' supervised release, and was ordered to forfeit $17,542,459. *U.S. v. Rogas*, Judgment (S.D.N.Y. Nov. 9, 2022).

The Judgment also ordered, *inter alia*, that as to the forfeited funds, after satisfaction of the mandatory $100 assessment, priority be given to claims of "restitution principal" followed by "restitution interest," ahead of other claimant categories. *Id*. at 7. In an order dated December 9, 2022, Rogas was ordered to make restitution to the victims of the offense to which he pleaded guilty, in the total amount of $112,276,409.50.

### 3. *Resolution of the Merits of the Present Civil Proceeding*

The stay in the present action was partially lifted in November 2022 to permit the SEC to file the Amended Complaint, and in early 2023 was entirely lifted.

Following lengthy negotiations, on March 7, 2024, Rogas and the SEC entered into an agreement to settle the securities fraud claims against him. In that agreement, Rogas acknowledged that he had "pleaded guilty to criminal conduct relating to certain matters alleged in the Amended Complaint in this action" and had "admitted the facts set out in the transcript of his plea allocution." (Notarized Consent of Defendant Adam P. Rogas dated March 7, 2024 ("Rogas Consent"), ¶ 2.) Rogas also, *inter alia*, referring to himself as "Defendant,"

> *agree[d] that the Court shall*, pursuant to Section 21(d)(2) of the Exchange Act . . . and Section 20(e) of the Securities Act . . . , *prohibit Defendant from acting as an officer or director* of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act . . . or that is required to file reports pursuant to Section 15(d) of the Exchange Act . . . . *Defendant further agrees that the length of time of the Officer and Director Bar shall be determined by the Court, upon motion of the Commission.* Defendant further agrees that, *in connection with the Commission's motion for an Officer and Director Bar*, and at any hearing held on such a motion: *(a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Amended Complaint and as admitted in the plea transcript attached as Exhibit A*; (b) Defendant may not challenge the validity of this Consent or the Judgment; *[and] (c) solely for the purposes of such motion, the allegations of the Amended Complaint shall be accepted as and deemed true by the Court* . . . .

(*Id*. ¶ 4 (emphases added).)

With respect to the Officer and Director Bar eventually to be ordered by

-16-

the court, however, Rogas reserved the right to appeal with respect to the Bar's duration. (*See id*. ¶ 6 ("For the sake of clarity, this Consent does not waive Defendant's right to appeal from any determination made by the Court as to the period of the Officer and Director bar pursuant to paragraph four, *supra*.").)

A September 18, 2024 interim "Judgment as to Defendant Adam P. Rogas" (or "Interim Civil Judgment") was entered in accordance with the Rogas Consent by Judge Berman, to whom the case had been reassigned on March 15, 2024. The Interim Civil Judgment principally held Rogas liable for disgorgement of $17,542,459.00 and liable to the Commission for $89,150.20 in prejudgment interest thereon, and enjoined him from securities laws violations as indicated above. It also ordered that Rogas's disgorgement liability be deemed satisfied by the order of restitution entered in *U.S. v. Rogas*.

The Interim Civil Judgment noted in connection with the Commission's motion for an Officer and Director Bar that "[n]either this Judgment, nor the Consent, incorporated herein, shall operate to waive Defendant's right to appeal from any determination made by the Court as to the period of the Officer and Director bar." Interim Civil Judgment at 4.

4. *The Imposition of a Lifetime Officer and Director Bar*

The SEC thereafter moved for the imposition of a permanent Officer and Director Bar, arguing that the nature and history of Rogas's fraudulent conduct made it likely that misconduct would recur--making him unfit to be entrusted with the position of officer or director of a publicly traded company--and that a bar of shorter duration would be insufficient to protect the public. (*See* SEC Opening Brief Seeking a Permanent Officer and Director Bar, Civ. Dkt. No. 218, at 8-15.) Rogas opposed a bar of such duration, arguing that his conduct was "entirely aberrational"; that he had never engaged in nor been accused of any criminal activity, let alone securities misconduct; and that the bar should be no longer than five years. (*See* Rogas Brief in Opposition to SEC Request for a Lifetime Director and Officer Bar ("Rogas Opposition to Lifetime Bar"), Civ. Dkt. No. 219, at 1, 13, 15.)

In its Decision and Order dated December 12, 2024, the district court, after considering each side's arguments, granted the SEC's motion. *See SEC v. Rogas II*, 2024 WL 5088097 (or "*Rogas II*"), at \*1, \*8-\*9. Having noted that Congress authorized officer and director bars in order "'to protect public investors from persons who have already demonstrated, by engaging in deliberate fraudulent conduct, that they should not be entrusted with power over investor funds,'" *id*. at \*4 (quoting H.R. Rep.

-18-

No. 101-616, at 13 (1990)), the district court also noted that our Court had

> outlined six . . . factors as "useful in making the unfitness assessment," including: "(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur,"

*Rogas II* at *5 (quoting *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995) ("*Patel*")). The district court proceeded to consider the so-called *Patel* factors.

With regard to the first, third, fourth, and fifth factors, the court found that "[w]ithout doubt, Rogas' violations of the securities laws were egregious." *Rogas II* at *5. Instead of insisting, in his fiduciary position as NS8's CEO, on financial statements and representations that were true and accurate, Rogas himself engaged in flagrant, deliberate, and personally profitable securities fraud in 2018-2020 by altering the bank statements in NS8's Revenue Account, and by sending the falsified statements to its finance department. *See id*. at *2, *5. During that period, "Rogas 'defrauded NS8 investors in various securities offerings by falsifying NS8's bank statements to give the appearance that NS8 was generating millions of dollars in customer revenue with tens of millions of dollars of assets on hand.'" *Id*. at *2 (quoting Amended Complaint ¶ 31). In his plea of guilty to securities fraud, "he admitted that he [had] acted knowingly,

-19-

willfully, and with an intent to defraud." *Id*. at *7; *see also U.S. v. Rogas*, Plea Hearing Transcript at 21-26 (S.D.N.Y. Mar. 16, 2022) ("Plea Hearing Tr.").

The district court observed that Rogas had a large economic stake in the success of his frauds, and personally reaped more than $17.5 million from the $149 million that NS8 received in its three 2019-2020 offerings. *See Rogas II* at *5. And it found significant the fact that Rogas had assiduously pursued his fraudulent conduct in aid of receiving a large personal payout when he was already receiving a substantial salary of $268,000-$422,000. *See id*.

The district court considered Rogas's contention that his fraudulent conduct was "'entirely aberrational.'" *Id*. at *1 (quoting Rogas Opposition to Lifetime Bar); *see also U.S. v. Rogas*, Rogas Sentencing Memorandum at 1, 8, 9 (S.D.N.Y. Oct. 7, 2022) (characterizing his fraudulent conduct as a "singular aberrant event" and a "moment" in which he made a "wrongful and uncharacteristic mistake in judgment"). The court rejected that characterization. Reiterating its view that Rogas's conduct was "egregious," the court noted that Rogas had "intentionally altered NS8's bank statements"--with a "high degree of scienter," and "not by mistake or accident." *Rogas II* at *7 (internal quotation marks omitted). It found that "Rogas' violations were not an isolated incident"; that "his fraud over 30 months was recurrent and systematic in

-20-

nature"; that "Rogas altered NS8 bank statements every month"; and that he "repeatedly and intentionally provided falsified documents to investors in connection with raising nearly $150 million in three **separate** securities offerings." *Id*. (emphasis in original) (internal quotation marks omitted).

As to the second *Patel* factor, the court noted the Commission's concession that "while Rogas' fraudulent conduct occurred repeatedly and over a period of more than two years, Rogas is not (technically) a 'repeat offender' as he has not previously been prosecuted for violating the securities laws." *Id*. at *6. The court found that "in this case, . . . the strength of *the remaining Patel indicators* support the conclusion that Rogas is permanently unfit to serve as an officer or director of any public company." *Id*. at *9 (internal quotation marks omitted) (emphasis ours).

As to the sixth *Patel* factor--which is the overarching concern for whether there is a likelihood that misconduct will recur--the district court noted that Rogas had provided false information to be given to regulators and potential investors, "falsely inflating the company's reported revenue and assets by significant amounts months after months" for some "two and a half years," in connection with "at least three securities offerings that raised approximately $149 million from investors." *Id*. at *5-*6.

The court further found it egregious that Rogas had "attempt[ed] to hide

-21-

his fraud proceeds" by, *inter alia*, "purchas[ing a] Dominican Residence" (as discussed in a Rogas text exchange with an associate), and that he "took other assets to the Dominican Republic in order to move them offshore." *Id*. at *6 (internal quotation marks omitted). And it noted that "even after his arrest," Rogas violated the Freeze Order by moving more than $1.6 million to a newly opened account at a different bank, in order to spend large sums of money on luxury items, including a swimming pool. *See id*. The court concluded that "Rogas' conduct demonstrates a prevailing inclination . . . to place his own self-interest ahead of the interests of his investors and the public." *Id*. at *8 (internal quotation marks omitted).

The district court observed that Rogas was not a "repeat offender" as that term was used in *Patel* to refer to one who had been prosecuted previously, *id*. at *6; but the court found it material that Rogas's past fraudulent conduct was continual. Further, the court noted that "'Rogas's brazen, deceptive conduct continued even after the SEC contacted NS8'"; after "[t]he SEC issued subpoenas to Rogas and to NS8 in connection with its investigation into fraud at NS8, . . . 'Rogas continued to alter bank statements.'" *Id*. at *3 (quoting Amended Complaint ¶¶ 8, 73).

The district court rejected Rogas's contention that a lifetime bar is inappropriate when the defendant has had no prior convictions. The court recognized

-22-

that there is no such condition in the statutory authorization for Officer and Director Bars, *see Rogas II* at *5 (citing 15 U.S.C. § 78u(d)(2)); that according to *Patel* itself, "it is not essential for a lifetime ban that there be past violations," 61 F.3d at 142; and that courts have previously "had 'no trouble concluding' that [a] defendant was 'permanently unfit' to serve as an officer or director, even though 'the criminal conviction . . . that form[ed] the basis of [the defendant's] civil liability [was] his first conviction,'" *Rogas II* at *9 (quoting *SEC v. Gupta*, No. 11-CV-7566, 2013 WL 3784138, at *4 (S.D.N.Y. July 17, 2013)).

Finding that the circumstances in the present case, including Rogas's apparent disdain for federal investigations into securities fraud and his "prevailing inclination . . . to place his own self-interest ahead of the interests of his investors and the public," persuaded it that Rogas was likely to engage in misconduct in the future if he again became an officer or director of a publicly traded company, the court

> order[ed] and direct[ed] that, effective immediately, Adam P. Rogas is permanently barred from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78*o*(d)] because a permanent [] bar is both necessary and in the public interest.

*Rogas II* at *8-*9 (internal quotation marks omitted).

## C. *Rogas's Representation by Pillsbury*

In the meantime, on September 9, 2020, after Rogas hired Pillsbury to represent him in connection with any issues concerning his role as President and CEO of NS8, Rogas had his PhutureCorp entity wire Pillsbury $4 million. On September 18, 2020, Pillsbury was notified of the TRO freezing Rogas's assets. Based on information provided by Rogas and Pillsbury, the district court found that, for Pillsbury's legal services rendered through that date, the $4 million had been reduced to $3,612,601.76.

As discussed in Part III below, the district court in *SEC v. Rogas I* in 2024 granted a motion by the SEC to require Pillsbury to turn that amount over to the government, on the ground that the $3,612,601.76 was an asset of Rogas that was frozen by the TRO and the Freeze Order, and thus could not be used to pay for Pillsbury's legal services to Rogas thereafter. Rogas and Pillsbury, in No. 25-35, challenge that decision, arguing that the $4 million sent to Pillsbury by Rogas's entity PhutureCorp on September 9 was not covered by the TRO and Freeze Order, on the theory that, upon its September 9 receipt by Pillsbury, the $4 million was the property of Pillsbury, not Rogas.

## II. THE CHALLENGE TO THE DURATION OF THE OFFICER AND DIRECTOR BAR

On appeal from *SEC v. Rogas II*, Rogas contends that the district court abused its discretion by imposing a lifetime Officer and Director Bar, rather than a bar of shorter duration, arguing that the court improperly considered him to be a repeat offender, thereby "infect[ing] its analysis of the *Patel* factors"; that it misevaluated the likelihood of his recidivism by ignoring his acceptance of responsibility; and that it imposed the lifetime bar for the improper purpose of punishing him. (*See* Rogas's brief on appeal at 26-34, 34-37, 39-41.)

We review the imposition of injunctive relief and civil penalties for abuse of discretion, *see, e.g.*, *SEC v. Pentagon Capital Management PLC*, 725 F.3d 279, 287 (2d Cir. 2013); *SEC v. Bankosky*, 716 F.3d 45, 47 (2d Cir. 2013) ("*Bankosky*"); and "the burden of showing that the court abused [its] discretion . . . necessarily is a heavy one," *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972), *abrogated on other grounds by Liu v. SEC*, 591 U.S. 71 (2020). "Under this standard, we will reverse only if we have a definite and firm conviction that the court below committed a clear error of judgment in the conclusion that it reached upon a weighing of the relevant factors."

*Bankosky*, 716 F.3d at 47 (internal quotation marks omitted).

Rogas has not met this standard. The statutory provision for an Officer and Director Bar gives courts ample discretion; the *Patel* factors are neither mandatory nor exclusive; the district court gave appropriate consideration to the *Patel* factors, did not consider Rogas as a "repeat offender" as that term was used in *Patel*, and gave adequate explanations for its assessment that Rogas was likely to recidivate if he were again to be an officer or director of a publicly traded company; and the record amply supports the court's conclusions.

The SEC commenced this action in September 2020 pursuant to § 21 of the Exchange Act, 15 U.S.C. § 78u, which provides, *inter alia*, that when it appears to the Commission that a person is engaged in, or is about to engage in, acts or practices constituting a violation of the Exchange Act or a Rule promulgated thereunder, the Commission may bring an action in an appropriate federal court to enjoin such acts or practices. *See* 15 U.S.C. § 78u(d)(1). Rogas thereafter, in the criminal action, pleaded guilty to violating § 10(b) of the Exchange Act and Rule 10b-5 thereunder, 15 U.S.C. § 78j(b) and 17 C.F.R. §240.10b-5. (*See*, *e.g.*, Rogas Consent ¶ 2.) In an action brought under § 78u(d)(1),

the court may prohibit, conditionally or unconditionally, and

*permanently or for such period of time as it shall determine*, any person who violated section 78j(b) of [Title 15] or the rules or regulations thereunder from acting as an officer or director of any issuer that has a class of securities registered pursuant to section 78*l* of [Title 15] or that is required to file reports pursuant to section 78*o*(d) of [Title 15] *if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer*.

15 U.S.C. § 78u(d)(2) (emphases added).

In 1995 when *Patel* was decided, § 78u(d)(2) "provide[d for] a bar on service as an officer or director . . . based on *substantial* unfitness," *Patel*, 61 F.3d at 142 (emphasis added). In *Bankosky*, we noted that "[i]n 2002, Congress replaced 'substantial unfitness' with simply 'unfitness,'" 716 F.3d at 48 (citing Sarbanes-Oxley Act of 2002, § 305(a), Pub. L. No. 107-204, 116 Stat. 745, 778-79 (2002) (amending 15 U.S.C. § 78u(d)(2))); and we stated that

> the legislative history demonstrates that Congress's intent was to lower the threshold of misconduct for which courts may impose director and officer bans. *See* S.Rep. No. 107-205, at 27 (2002), *available at* 2002 WL 1443523 (explaining that standard was changed to "unfitness" because "'substantial unfitness' standard . . . [was] inordinately high, causing courts to refrain from imposing bars even in cases of egregious misconduct") . . . .

*Bankosky*, 716 F.3d at 48. We noted that the

> lowering [of] the threshold of misconduct required to impose the officer and director bar[] did not undermine the usefulness of the *Patel* factors, which indicate where evidence of unfitness might be

-27-

found in a defendant's misconduct. Whatever the contours of the new standard, "unfitness" is clearly a lower hurdle than "substantial unfitness." *See* S.Rep. No. 107-205, at 27 (2002). It necessarily follows that a person who is "substantially unfit" under the *Patel* analysis is also "unfit" under the revised statute. Thus, the *Patel* factors are just as relevant to determining "unfitness" as they were to determining "substantial unfitness."

*Id*.

Rogas, relying on the inclusion of whether the defendant was a repeat offender among the factors that *Patel* listed as usually worthy of consideration, argues that, as a first offender, he could not properly be subjected to a lifetime Officer and Director Bar. He notes relentlessly that he had not been convicted of a securities violation previously (*see*, *e.g.*, Rogas brief on appeal at 1, 7, 20, 26-27, 37); and he apparently believes that, in the court's assessment of whether the defendant is likely to engage in misconduct, no factor other than a prior conviction is material (*see*, *e.g.*, *id*. at 26 ("a single, extended course of conduct does not make a defendant a 'repeat offender'"); *id*. ("the duration and seriousness of his violation" did not make him "a repeat offender"); *id*. at 28 ("Rogas' efforts to avoid detection" did not "justify treating him as a repeat offender"); *id*. at 28 n.10 ("Rogas' violation of the asset freeze while the SEC Matter was stayed also has no bearing on whether he is a repeat offender")).

But *Patel* did not purport to announce a checklist of factors that must be

present or absent. We said

> [t]hese factors are useful in making the unfitness assessment, although we do not mean to say that they are the only factors that may be taken into account *or even that it is necessary to apply all these factors in every case*. A district court should be afforded substantial discretion in deciding whether to impose a bar to employment in a public company.

*Patel*, 61 F.3d at 141 (emphasis added). And indeed, as pertinent to the present case and to Rogas's heavy reliance on the fact that he had not been prosecuted for criminal acts in the past, we noted in *Patel* that so long as the "district court articulate[s] the factual basis for a finding of the likelihood of recurrence" of misconduct, "*it is not essential for a lifetime ban that there be past violations*," *id*. at 142 (emphasis added).

Rogas asserts that the lifetime bar was "[o]verkill," and argues that "the simple fact that a defendant used his position as an officer and director to engage in misconduct . . . in no way justif[ies] the prediction that future misconduct will occur." (Rogas brief on appeal at 37-38, 35 (internal quotation marks omitted).) But the "simple fact" label ignores much of what the district court considered--which even Rogas acknowledges included "the egregiousness of Mr. Rogas' conduct, his level of scienter, and the length of time over which he carried out his scheme" (*id*. at 35). And it ignores aspects of the court's analysis of the record in addition to Rogas's "high degree of

scienter" and his steadfast persistence for 30 months of falsifications. *Rogas II* at *7 (internal quotation marks omitted).

The district court recognized the magnitude of Rogas's fraudulent conduct, which "falsif[ied] NS8's bank statements to give the appearance that NS8 was generating millions of dollars in customer revenue with tens of millions of dollars of assets on hand." *Id*. at *2 (quoting Amended Complaint ¶ 31).

The court also noted that when Rogas learned that an employee had discovered his fraudulent inflations and had informed the SEC, he had the employee fired. *See Rogas II* at *3. This not only violated § 21F(h) of the Exchange Act, 15 U.S.C. § 78u-6(h), the whistleblower-protection provision; it deprived the Company of a careful, competent, and responsible employee, in the interest of perpetuating Rogas's fraudulent conduct. And indeed, despite knowing that the SEC had been alerted, Rogas continued his monthly fraudulent inflation of NS8's Revenue Account balances.

In addition, the district court noted that even after the SEC served Rogas with subpoenas investigating suspected fraud in a prior NS8 offering of securities, Rogas continued to inflate NS8's revenue numbers. *See Rogas II* at *3. Rogas's fraudulent numbers were used in connection with "at least three" "**separate** securities offerings." *Id*. at *5, *7 (emphasis in original) (internal quotation marks omitted). And

having "altered bank statements to show millions of dollars of fictional customer revenue and assets," Rogas "directly benefited when NS8 conducted a tender offer with" money NS8 raised from "new investors," and bought his shares for more than $17.5 million. *Id*. at *2 (internal quotation marks omitted).

The record detailed the millions of dollars by which Rogas fraudulently inflated the NS8 Revenue Account balances. The Amended Complaint--whose allegations, as noted above, are not disputed--charted month-by-month from January 2018 through June 2020 the exact amounts by which Rogas inflated the balances in NS8's Revenue Account, revealing the magnitude of the frauds. As shown in the Amended Complaint ¶ 31, from the outset the falsely inflated amount was never less than $1 million; and it quickly rose, because Rogas did not simply inflate that balance each month--in all but one of those months, he also increased the amount by which the balance was inflated. For example, in the first three months, January, February, and March of 2018, the falsely inflated amounts were, respectively, less than $1.1 million, more than $1.1 million, and more than $1.3 million. By the last three months of 2018, the falsely inflated amounts were, sequentially, more than $4.3 million, more than $5.1 million, and more than $6 million.

Moreover, after becoming aware that his fraud had been discovered and

-31-

was being investigated, Rogas's increases of the falsely inflated balances became steeper. For August 2019--the month in which Rogas learned that NS8's whistle-blowing Employee had informed the SEC of the fraud and had sent documents to the SEC--Rogas's falsely inflated amount was more than $17.9 million. Unfazed by the Employee's tip to the SEC, Rogas increased the falsely inflated amount for September 2019 to more than $23.7 million. (*See* Amended Complaint ¶ 31.)

Rogas was similarly undaunted by actual federal investigation. SEC served Rogas with its fraud-investigating subpoenas in November 2019 and March 2020. (*See id*. ¶¶ 8, 72.) In 2019, Rogas increased the falsely inflated amount for November to more than $29.1 million, and for December to more than $34.4 million. (*See id*. ¶ 31.) In 2020, Rogas increased the falsely inflated amount for March to more than $46.8 million, for April to more than $51.5 million, for May to more than $56.1 million, and for June to more than $62 million. (*See id*.)

In actuality, from January 2018 through June 2020, there were only six months in which the true balance in NS8's Revenue Account was more than $1 million; and in no month was its actual balance as high as $4.1 million. But prospective investors in 2019 and 2020 were led to believe, from Rogas's doctored Revenue Account statements, that NS8 had many millions of dollars in revenue, with a

compounded growth rate of nearly 450 percent per year between January 2018 and December 2019. In 2019 and 2020, NS8's three securities offerings raised a total of $149 million from investors who relied on numbers inflated by Rogas; and NS8 used nearly 12 percent of the total--*i.e.*, $17,542,459--to repurchase Company shares from Rogas. (*See id*. ¶ 2; A.226.)

The district court remarked on Rogas's apparent avarice. Although as CEO and President of his relatively young and struggling company "Rogas received a significant salary of between $268,000 to $422,000 from 2018 to 2020, he nevertheless sought and obtained $17.5 million of fraud proceeds, *i.e.*, in addition to his substantial compensation." *Rogas II* at *5. The $17.5 million was more than 41-to-65 times Rogas's "substantial" salary. *Id*. We also note that even at the lower end of the pay range identified by the court, Rogas's salary for at least 20 of the 30 months was more than twice as high as the actual balance in NS8's Revenue Account--and in many months his salary was more than 10 times as high as NS8's Revenue Account balance. (*See* Amended Complaint ¶ 31.)

We are also unpersuaded by Rogas's argument that the permanent injunction was inappropriate on the ground that the district court failed to give his "complete and unconditional acceptance of responsibility any weight when assessing

whether he was likely to commit further violations of the securities laws." (Rogas brief on appeal at 1; *see also id*. at 10 ("unconditional acceptance"); *id*. at 20 ("unequivocal acceptance"); *id*. at 34 ("sincere[] and unqualified acceptance").) As evidence of his complete, unequivocal, sincere recognition of the wrongfulness of his conduct, he cites--as he did in the district court (*see* Rogas Opposition to Lifetime Bar at 3)--the written submissions he gave the court in his criminal case and the statement he made at his plea hearing. Rogas states that in his plea allocution, he

> affirmed his unconditional acceptance of responsibility for his actions and promised to provide meaningful restitution:

>> I accept full responsibility for these actions, and I am committed to doing everything in my power for as long as it takes to provide restitution to those whom my actions have harmed, to live a responsible and productive life, and to continue as a committed husband to my wife Beth and father to my two young daughters . . . .

(Rogas brief on appeal at 10 (quoting Plea Hearing Tr. 22).) Rogas argues that while the district court recognized that a defendant's recognition of the wrongfulness of his conduct can be probative as to the likelihood of future recurrence, it "ignored" that principle. (Rogas brief on appeal at 35.)

We doubt that the district court ignored the principle or Rogas's submissions. Rather, we infer that the court paid close attention to Rogas's

protestations of acceptance of responsibility and found that they did not dispel the indications that his misconduct would likely recur, given that Rogas's oral statements at his plea hearing provided more cause for concern than for comfort.

The plea-hearing statement on which Rogas relies appears in the following context.

THE COURT:  So Mr. Rogas, . . . *tell me in your own words* what you did to make you believe you're guilty of the charge in Count One of the indictment.

THE DEFENDANT:  . . . .

In my position as president and CEO, *I made a series of poor judgments and decisions that led to me* making material misrepresentations to potential and actual investors in NS8 *inaccurately reflecting the company's revenue.* These misrepresentations were made in connection with rounds of fundraising the company conducted through the sale of securities in the fall of 2019 and the spring of 2020.

This is not who I am, and I have never before violated the law like this.  My actions were not for personal financial gain or profit.  *My misplaced intent was to afford the company, my colleagues and team members--which I truly believed in--the time needed to generate enough revenue to sustain, grow, and support the hundreds of jobs that we had created.*

*I had no doubt that given this time, NS8 would be very successful and innovative, and that it would both produce the promised returns and benefits for its investors* and employees and continue to provide significant cybersecurity value and protection to its customers.

Upon my resignation, I attempted, through counsel, to contact the company management to offer assistance, the return of money and stock, in an effort to keep the company viable and protect the shareholder value and protect the hundreds of jobs that we had created.

That being said, I fully understand what I did was wrong. I understand that what I did broke the laws of the United States, and *it sickens me that the actions* that I alone took *in an effort to protect ended up harming so many people.*

I accept full responsibility for these actions, and I am committed to doing everything in my power for as long as it takes to provide restitution to those whom my actions have harmed, to live a responsible and productive life, and to continue as a committed husband to my wife Beth and father to my two young daughters . . . .

Thank you, your Honor.

(Plea Hearing Tr. 20-22 (emphases added).)

Rogas's statement was followed by illuminating questions from the court,

suggestions by the Assistant United States Attorney ("AUSA") for further clarification,

and a proposed "clarif[ication]" by Rogas's attorney.

THE COURT: . . . [W]hen you made those material misrepresentations, did you know those representations to be false?

THE DEFENDANT: I did.

THE COURT: And *did you make those misrepresentations with the intent to defraud potential investors*?

THE DEFENDANT: *I certainly wasn't thinking of it that way, but I guess it did*, your Honor.

THE COURT: So that was a yes?

THE DEFENDANT: Yes.

(*Id*. at 22-23 (emphases added).)

After the AUSA asked the court to clarify that Rogas admitted "knowing [his misrepresentations] were misleading and wrong and that investors were relying on those statements when they invested money with NS8" (*id*. at 25), the court tried again, and defense counsel William M. Sullivan, Jr., volunteered to interpret:

THE COURT: . . . . When you made material misrepresentations to investors, first of all, did you know what you were doing was wrong and illegal?

THE DEFENDANT: I knew -- yes.

THE COURT: Yes, you did know.

THE DEFENDANT: I did know.

. . . .

THE COURT: And you knew it was illegal to make misrepresentations to investors.

THE DEFENDANT: Yes.

MR. SULLIVAN: Your Honor, if I might clarify, I think *Mr.*

*Rogas is trying to say that at the time he made the misrepresentations, the specific intent was not to defraud the investors* at that time, even though *he knew that he was making material misrepresentations*, that the information he was claiming was false, *but he believed the company would ultimately survive*, but that's not enough to allow him to articulate a defense, just so we're clear. *He knew what he was saying was wrong, but he also believed at the end of the day that the investors would recoup their money, and more*. That's not enough to overcome the responsibility that he has for this offense, but *just for purposes of clarity*, we're just trying to give some context to *the defendant's state of mind*.

(*Id*. at 25-26 (emphases added).)

This record plainly does not support Rogas's claim that the district court erred in not taking into account his purported acceptance of responsibility. While Sullivan's "clarif[ication]" did tend to clarify that Rogas "knew that he was making material misrepresentations," the qualification that his "specific intent was *not* to defraud the investors at that time" plainly did not show unconditional acceptance of responsibility. (*Id*. at 26 (emphasis added).)

Further, the Sullivan interpretation emphasized Rogas's own statement that his goal was merely to assist his relatively new company to survive long enough to prosper, and that Rogas "*believed the company would ultimately survive*," that he "*knew what he was saying was wrong, but he also believed at the end of the day that the investors would recoup their money, and more*." (*Id*. at 26 (emphases added).) But "[j]ustice is not

-38-

served by inflicting injustice. The ends do not justify the means. There is no 'Robin Hood' defense to illegal and wrongful conduct." *Chevron Corp. v. Donziger*, 833 F.3d 74, 85 (2d Cir. 2016) (other internal quotation marks and emphases omitted); *see, e.g.*, *United States v. Connelly*, 156 F.3d 978, 982-83 (9th Cir. 1998) (upholding denial of sentencing credit for a defendant convicted of fraud whose statements "at sentencing [were] sufficiently inconsistent with acceptance of responsibility" in light of his "'Robin Hood story' regarding the motive behind his frauds").

Nor did Rogas's characterizations, in his own words, of his actions and his impetus for those actions suggest that he would be unlikely to engage in similar end-justifies-the-means conduct if he were in a position to do so in the future. He said that "poor judgments and decisions . . . *led*" him to "mak[e] material misrepresentations to potential and actual investors" (Plea Hearing Tr. 21 (emphasis added))--as if the real misdeeds were those vague and unexplained "judgments and decisions" rather than his specific misfeasance in changing the electronic versions of the numbers in NS8's Revenue Account statements to inflate the balances shown, and causing his doctored versions to be distributed to potential investors. And he minimized the magnitude and effect of his doctoring the bank statements by indicating that, in his view, the altering of stated bank balances from, for example, $2,000 to $5 million

(*see* Amended Complaint ¶ 31 (November 2018)), and changing $28,000 to $62 million (*see id*. (June 2020)) were merely "inaccurate[] reflect[ions]" of the actual balances.

We find no error in the district court's declining to credit Rogas's contention that his *haec verba* professions of acceptance of responsibility should have persuaded the court that he was not likely to engage in misconduct if he were to be an officer or director of a public company in the future. Nor do we see any merit in Rogas's contention that the district court imposed the permanent Officer and Director Bar in order to punish him.

We conclude that the district court properly considered the actual characteristics and nature of Rogas's fraudulent conduct and weighed the relevant factors in assessing the likelihood that Rogas would engage in misconduct if he were again to be an officer or director of a publicly traded company. They included:

■ the persistence of Rogas's decision to falsify NS8's financial condition every month for two and a half years;

■ his decision to inflate the statement of its revenue every month, and nearly always by an amount greater than the inflated amount for the prior month;

■ his articulated view that overstating NS8's Revenue Account balance by many millions of dollars--as much as $62 million--when most of the actual balances are well below $100,000 is merely an "inaccurate[] reflect[ion]" of the balance;

■ his attempt to preserve continuation of his fraudulent practice by firing a valuable Company employee;

■ his seeking and obtaining, in addition to his substantial salary, $17.5 million of the funds raised from investors who relied on the fraudulent revenue statements;

■ his attempts to protect his fraud proceeds from repatriation by taking assets "offshore";

■ his withdrawal--in violation of the Freeze Order that was intended to preserve funds for return to defrauded investors--of more than $1.6 million, which he proceeded to spend on luxuries or convert to cryptocurrency; and

■ his apparent utter disdain for federal fraud regulation and investigations as, after he received SEC fraud-investigative subpoenas, he not only did not end his fraudulent conduct, he sharply increased the magnitude of his fraudulent numbers.

The district court's conclusion that Rogas evinced a "prevailing inclination . . . to place his own self-interest ahead of the interests of his investors and the public" and revealed a likelihood that he would engage in misconduct in the future if he again became an officer or director of a publicly traded company, *Rogas II* at *8-*9 (internal quotation marks omitted), is well supported by this record. Given those conclusions and Rogas's belief, which he appears still to hold, that the end justifies the means, we see no error, much less a clear error, in the district court's judgment that the public would be best served by imposing on Rogas the lifetime Officer and Director Bar.

-41-

## III. THE ROGAS/PILLSBURY CHALLENGES TO THE TURN-OVER ORDER

In No. 25-35, Rogas and Pillsbury challenge the decision of the district court in *SEC v. Rogas I*, 2024 WL 4930362 (or "*Rogas I*"), requiring Pillsbury to turn over to the government $3,162,601.76, representing the remainder of Rogas's $4 million retainer that Pillsbury held on September 18, 2020, when it was informed of the TRO freezing Rogas's assets. The SEC sought such an order in a motion filed in May 2024 ("Turn-Over Motion"); *Rogas* opposed, filing a cross-motion seeking a declaration that the Freeze Order did not apply to the $4 million retainer (*see* Rogas Cross-Motion Opposing Turn-Over Motion, Civ. Dkt. No. 191 ("Rogas/Pillsbury Opposition")). The district court, after receiving briefing and written submissions from the parties, including a May 27, 2024 letter from the DOJ addressed to both sides ("DOJ Letter") and submitted by the SEC, heard oral argument on July 10, 2024.

The record on these motions, with respect to the nature of the retainer, the respective contentions of Pillsbury and the SEC, and the communications among Pillsbury, the SEC, and the DOJ during Rogas's criminal prosecution, is described by the district court in *Rogas I*, familiarity with which is assumed, and is briefly summarized here.

A. *News on $4 Million: Who Knew What, From Where, When, and Why*

As adverted to in Part I.C. above, in late August 2020, after an additional NS8 employee had discovered Rogas's fraud, Rogas contacted Pillsbury partner Sullivan, and engaged the services of Pillsbury in connection with any issues concerning his positions at NS8. The record contains an engagement letter which bears the date August 31, 2020, but which Rogas signed on September 1 and delivered to Pillsbury on September 2 (hereinafter referred to as the "September 2, 2020 engagement letter" or the "September 2 Letter"). (*See, e.g.*, Rogas Decl. ¶¶ 3-5.) In that letter, it was agreed that Rogas would remit a $15,000 retainer to Pillsbury and would continually replenish that amount as needed to have Pillsbury's "work on his behalf" continue. (Declaration of William M. Sullivan, Jr., dated May 17, 2024 ("Sullivan Decl."), ¶ 5; *see also* September 2 Letter Addendum (A.200); Rogas Decl. ¶ 5).)

"Several days later," Rogas spoke with Sullivan and two other Pillsbury attorneys in a "multi-hour call" in which Rogas "provided a comprehensive recitation of [his] time with NS8 and actions [he] had taken in [his] capacity as President and CEO." (Rogas Decl. ¶ 6.) Thereafter, Sullivan advised that Rogas would face multiple investigations and lawsuits that would be lengthy and costly. (*See id*. ¶¶ 7-8; Sullivan Decl. ¶ 7.) According to Rogas, on the basis of all of those conversations,

-43-

on September 9, 2020, [he] made the independent and voluntary decision to initiate two separate wire transfers to Pillsbury totaling $4,000,000, an amount well in excess of the small initial retainer required by the engagement letter.

(Rogas Decl. ¶ 9.) Sullivan similarly stated:

Therefore, on September 9, 2020, Mr. Rogas sent Pillsbury two wire transfers totaling $4 million (the "Retainer") from a Silicon Valley Bank account associated with PhutureCorp, an entity affiliated with Mr. Rogas. As Mr. Rogas's declaration . . . independently and expressly confirms, the Retainer was to secure Pillsbury's representation and pay in advance for the legal services Mr. Rogas expected Pillsbury would provide to him.

(Sullivan Decl. ¶ 8.)

There is in the record no engagement letter reflecting Rogas's September 9, 2020 payment of $4 million. While there was a letter dated September 14, 2020, modifying the September 2 Letter (in a respect not relevant here), the September 14 letter made no mention of Rogas's sending Pillsbury $4 million on September 9. Indeed, the addendum to the September 14 letter outlining financial aspects of "the legal services to be rendered for this representation" repeated the details of the September 2 Letter--*i.e.,* that Pillsbury was requesting a $15,000 retainer, and replenishments in the amount of $15,000. (*See* A.208.)

Pillsbury did not inform the SEC that it had received a $4 million retainer

-44-

from Rogas. Pillsbury maintained that it considered the TRO and the ensuing Freeze Order to be inapplicable to Rogas's $4 million retainer--which it had received prior to the issuance of the TRO--because it had been wired from PhutureCorp, a Rogas entity that was not named in the SEC complaint as a "relief defendant." (*See* Sullivan Decl. ¶¶ 8-12.)

The DOJ Letter stated that, in a series of phone calls in or about November 2020, the DOJ had informed Pillsbury, *inter alia*, that the $4 million retainer Rogas gave to Pillsbury had been fraud proceeds, and that those funds thus should not be used to pay Rogas's legal expenses. (*See* A.273.) It stated that the DOJ had asked Pillsbury to "segregate those crime proceed funds, and not spend down those funds to pay for attorney's fees," and that Pillsbury, although not conceding the accuracy of DOJ's information, "agreed not to further dissipate" the remaining amount of the $4 million retainer, which was "approximately $3.7 million." (*Id*.)

However, by February 2024, the DOJ understood that $2 million of the retainer funds had been billed by Pillsbury. At the July 10, 2024 hearing on these motions, in response to an inquiry by the court as to the status of the funds, Sullivan stated that Pillsbury had "been billing against the 4 million," and that "at this point, it's exhausted." (A.316.)

-45-

The SEC maintained that it had known nothing of Rogas's sending Pillsbury the $4 million retainer until September 2022, nearly two years after the asset freeze was imposed. The SEC stated that it became aware that Rogas had sent Pillsbury such a sum only because of the contents of a Pillsbury response to a 2022 SEC request for financial information from Rogas. That response, an untitled accounting document, was attached to the SEC's Turn-Over Motion, and showed that Rogas had an "Asset[]" of "$3,612,601.76" at "Pillsbury (Escrow)." (A.220; *see also id*. at 217 ("Unencumbered Assets," "Other Assets," "$3,612,601.76").)

B. *The Terms of the Freeze Order*

The Freeze Order, the terms of which were identical to those in the TRO, provided in relevant part as follows:

> A. $35,084,900 of assets, funds, or other property of Defendant Adam Rogas and Relief Defendants NS8 FP, LLC, MVP 2020, LLC, and Rogassi Enterprises, LLC, wherever located or by whomever held, and whether acquired before or after institution of this action, are frozen;

> B. Defendant, Relief Defendants, and their officers, directors, successor corporations, subsidiaries, affiliates, trustees, family members, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them who receive actual notice of this order . . . shall hold and retain within their

control, and otherwise prevent any disposition, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal whatsoever of any of their funds or other assets or things of value presently held by them, under their control or over which they exercise actual or apparent investment or other authority, in whatever form such assets may presently exist and wherever located, up to []$35,084,900; and

       C. *Any* bank, financial or brokerage institution or *other person or entity holding any funds*, securities or other assets in the name of, *for the benefit of*, or under the control of *Defendant Adam Rogas . . .* shall hold and retain within their control and prohibit the withdrawal, removal, transfer or other disposal of any such funds or other assets.

Freeze Order Parts I.A.-I.C (emphases added).  It also provided that "any party or non-party may seek [relief] from th[e Freeze Order] upon a proper showing."

*Id*. Part I.D.

C. *The Parties' Contentions as to the Nature of Rogas's Retainer*

In opposition to the SEC's Turn-Over Motion and in support of its own motion, Pillsbury argued principally that Rogas's $4 million retainer payment constituted an advance payment retainer under New York State law, that such retainers immediately become the property of the attorney upon receipt, and that, thus, the Freeze Order did not apply to it.  (*See* Rogas/Pillsbury Opposition at 7-15.)

According to Pillsbury, after Rogas's comprehensive description of the actions he had taken in running NS8,

> [i]t was immediately apparent that Mr. Rogas would likely be facing criminal, SEC and civil investigations and litigation and that any legal defense representation would be lengthy and expensive.
>
> 8. Therefore, on September 9, 2020, Mr. Rogas sent Pillsbury two wire transfers totaling $4 million (the "Retainer") from a Silicon Valley Bank account associated with PhutureCorp, an entity affiliated with Mr. Rogas. As Mr. Rogas's declaration (attached hereto as Exhibit A) independently and expressly confirms, *the Retainer was to secure Pillsbury's representation and pay in advance for the legal services Mr. Rogas expected Pillsbury would provide to him*.
>
> 9. Consistent with Pillsbury's understanding that the Retainer was an advance payment retainer for legal services expected to be provided, Mr. Rogas sent the Retainer directly to Pillsbury's operating account.
>
> 10. Once the Retainer was deposited into Pillsbury's operating account, the funds remained there; the Retainer was never transferred into a trust or escrow account, and *the funds were never treated by Pillsbury as property owned by Mr. Rogas,* under his control, *or for his benefit*.

(Sullivan Decl. ¶¶ 7-10 (emphases added).)

Rogas's declaration also took the position that he had divested himself of ownership of the $4 million--at least temporarily:

> 10. I executed these wire transfers to provide Mr. Sullivan and Pillsbury with advance payment to secure legal representation

-48-

and pay for all necessary and sufficient services to be provided, and to ensure that there would always be sufficient retainer funds for Mr. Sullivan and Pillsbury to work against, in representing me . . . . *When I transferred these amounts to Pillsbury, consistent with what I understand to be New York law, I lost my ownership interest in those funds; and, that was my intention in order to secure necessary and sufficient legal representation.*

11. I understood that Mr. Sullivan would work against the funds transferred to represent me and provide necessary and sufficient legal services for a period that I understood was expected to proceed for several years and very likely include multiple lawsuits. I further understood that Mr. Sullivan would treat the funds as advanced *payment for legal representation* to be billed at the hourly rate structure identified in the engagement letter. I communicated this understanding to Mr. Sullivan subsequent to my wiring the funds.

. . . .

13. . . . . *I understood that I still had the right* to . . . terminate the representation at any time if I so choose, and *to the return of any remainder of the retainer fund paid to Pillsbury at the conclusion of services.*

(Rogas Decl. ¶¶ 10-11, 13 (emphases added).)

The SEC, which had not learned of Rogas's $4 million payment to Pillsbury before September 2022, disputed Pillsbury's "advance payment" characterization of the $4 million. The SEC argued that it was instead a "security retainer," in which, under New York State law, the attorney holds the money solely in

order to guarantee the client's ability to pay for the services the client expects the lawyer to provide. (A.186.) The SEC argued that the $15,000 retainer Pillsbury and Rogas agreed to in their September 2, 2020 engagement letter was plainly a security retainer; it required an initial payment and periodic replenishments when the balance, because of services rendered, fell below the agreed level; and nothing in the record showed that the $4 million retainer was any different. A security retainer is the property of the client, not the attorney. *See, e.g., Entegra Power Group LLC v. Dewey & Leboeuf LLP*, 493 B.R. 421, 428-29 (Bankr. S.D.N.Y. 2013).

The SEC also argued that regardless of the type of retainer, which could affect ownership, the Freeze Order forbade any persons or entities from withdrawing, removing, transferring or otherwise disposing of any funds or assets they held "*for the benefit of* . . . Rogas," Freeze Order Part I.C. It argued that Pillsbury had held--and improperly had disposed of--the $4 million for the benefit of Rogas.

D. *The District Court's Decision*

The district court in *Rogas I* agreed with the SEC's view that the $4 million retainer was a security retainer that did not belong to Pillsbury:

The Court finds that Rogas did, in fact, retain an interest in that

-50-

portion of the retainer that was not yet earned. *See* Committee on Professional Ethics, Ethics Opinion 816, New York State Bar Association, ¶ 8 (Oct. 26, 2007); *see also Gala Enters., Inc. v. Hewlett Packard Co.*, 970 F. Supp. 212, 219 (S.D.N.Y. 1997). "The mere fact that the client advances money through retainer payment does not entitle the attorney to claim 'ownership' of the funds at the moment of receipt. It is in effect money of the client to be held in constructive trust with the attorney being entitled to payment as he performs work. If the attorney does not perform the work he must return the money." *In re Level 8 Apparel LLC*, [No. 16-13164, 2023 WL 2940489,] at *20 [(Bankr. S.D.N.Y. Apr. 13, 2023)].

*Rogas I* at *6 n.9.

Further, the district court ruled that "[e]ven if Rogas' funds were an advance payment retainer, $3.6 million was subject to the TRO and the Freeze Order," because "the unearned portion of the funds were [*sic*] . . . held by Pillsbury in the name of, *for the benefit of*, or under the control of Rogas and frozen by the [] Freeze Order." *Id*. (emphasis added) (internal quotation marks omitted). The court noted that PhutureCorp, from whose account Rogas had the $4 million wired to Pillsbury, had received $10 million of the $17.5 million that Rogas received as a result of his fraudulent conduct. *See id*. at *4 n.7. The court pointed out that

"[i]t is well-settled that a defendant has no right to use tainted assets for his legal defense." *SEC v. Ahmed*, 72 F.4th 379, 395 (2d Cir. 2023). A defendant has no "right to spend another person's money for services rendered by an attorney, even if those funds are the only way that the defendant will be able to retain the attorney

-51-

of his choice." *Caplin & Drysdale v. United States*, 491 U.S. 617, 626, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989).

*Rogas I* at *5.

We see no error in the district court's application of this principle to the facts in this case, either on the basis that the $4 million Rogas sent to Pillsbury was not an advance payment retainer and was in fact a security retainer, or on the basis that that money was intended to be used for the benefit of Rogas, defending him against the criminal, civil regulatory, or private civil litigation that he and Pillsbury anticipated. As to the nature of the retainer, the record contains no contemporaneous record to support the Rogas/Pillsbury characterization of it as an advance payment retainer. And while Sullivan stated in his affidavit that "the funds were never *treated* by Pillsbury *as* property owned by Mr. Rogas, under his control, or *for his benefit*," (Sullivan Decl. ¶ 10 (emphases added)), the manner in which Pillsbury "treated" the funds would not be dispositive. And in any event, that statement is belied by Sullivan's other statements--and similar statements by Rogas--that the money was to be used for Pillsbury's representation of Rogas in the expected prosecution, SEC litigation, and other civil lawsuits.

Further, there is documentary evidence from Pillsbury as to the status,

treatment, and ownership of the "$3,612,601.76" remainder of the $4 million that Rogas sent to Pillsbury. In September 2022, Sullivan responded to an SEC request for an accounting of Rogas's income and assets by sending the SEC an accounting document-- "Exhibit A"--that "contain[ed] all of the financial information provided" in *U.S. v. Rogas* to the "Probation Department in connection with Mr. Rogas' sentencing." (Letter from Sullivan to Nicholas P. Heinke, SEC Senior Trial Counsel, dated September 14, 2022 ("Sullivan Letter"), at 1.) Among "Unencumbered Assets," the document listed Rogas's "Other Assets" as "$3,612,601.76." (Sullivan Letter, Exhibit A at 3.) In the section identifying "Other Assets," it listed "$3,612,601.76," describing that sum as a "Deposit At PWSP LLP" and as an "Asset Located" at "Pillsbury (Escrow)." (*Id.*, Exhibit A at 6.)

Thus, although Sullivan asserted that "the Retainer was never transferred into a[n] . . . escrow account" (Sullivan Decl. ¶ 10), the Rogas asset information that Pillsbury submitted on his behalf--both to the Probation Department in his criminal case and to the SEC in the present case--showed that nearly two years after the asset freeze, Rogas had an "Unencumbered Asset" of "$3,612,601.76," which "Pillsbury" held in "Escrow."

The record also clearly supports the district court's ruling that, regardless of how the ownership of the $4 million retainer was characterized, Rogas and Pillsbury

intended that those funds were to be used for Rogas's benefit.  Although Sullivan stated that Rogas's $4 million was "never . . . *for his benefit*" (Sullivan Decl. ¶ 10 (emphasis added)), he also said that the "$4 million" that "on September 9, 2020, Mr. Rogas sent Pillsbury" was "*to secure Pillsbury's representation* and pay in advance *for the legal services Mr. Rogas expected Pillsbury would provide to him*" (*id*. ¶ 8 (emphases added)).  And Rogas similarly characterized the purpose of his $4 million as "retention of . . . Sullivan [and] Pillsbury . . . *to represent me* in this lawsuit, as well as in the [DOJ's] criminal prosecution, . . . and in related third-party civil litigation," and said his "advanced payment of funds" was "*for services to be provided in the course of that representation*." (Rogas Decl. ¶ 2 (emphases added); *see also id*. ¶ 10 (the "retainer funds" were "for Mr. Sullivan and Pillsbury to work against, *in representing me*" (emphasis added)); *id*. ¶ 13 ("I understood that I still had the right to . . . terminate the representation at any time if I so choose, *and to the return of any remainder of the retainer funds paid to Pillsbury at the conclusion of services*." (emphasis added)).)

We see no error in the district court's ruling that the $4 million Rogas sent to Pillsbury--from an account into which he had deposited $10 million he received as part of his profits from the 30 months of fraudulent inflation of NS8's revenues--was covered by the Freeze Order, and that Pillsbury violated that order by using profits

Rogas received from his fraud to defend him in the government's actions against him for that fraud.

## CONCLUSION

We have considered all of the arguments by Rogas and Pillsbury on these appeals and have found them to be without merit. The orders of the district court are affirmed.